1

```
                    UNITED STATES DISTRICT COURT
```
1
```
                    NORTHERN DISTRICT OF TEXAS
```
2
```
                          LUBBOCK DIVISION
```
3
```
UNITED STATES OF AMERICA,        )
              Government,        )
```
4
```
                                 )
VS.                              )  CAUSE NO. 5:23-CR-005-H
```
5
```
                                 )
FREDERICK FRANCIS GOLTZ,         )
```
6
```
              Defendant.         )
```
7

8
```
         -------------------------------------------------
```
9
```
                        SENTENCING HEARING
              BEFORE THE HONORABLE JAMES WESLEY HENDRIX
```
10
```
                   UNITED STATES DISTRICT JUDGE
```
11
```
                          AUGUST 3, 2023
                          LUBBOCK, TEXAS
```
12
```
         -------------------------------------------------
```
13

14
```
                      A P P E A R A N C E S
```
15
```
FOR THE GOVERNMENT:
UNITED STATES ATTORNEY'S OFFICE
```
16
```
1205 TEXAS AVENUE, SUITE 700
LUBBOCK, TEXAS 79401
```
17
```
BY:  JEFFREY R. HAAG
```
18
```
FOR THE DEFENDANT:
```
19
```
KING LAW
ATTORNEYS AT LAW
```
20
```
814 MAIN STREET, SUITE B
LUBBOCK, TEXAS 79401
```
21
```
BY:  MICHAEL L. KING
```
22

23
```
FEDERAL OFFICIAL COURT REPORTER: MECHELLE DANIEL, 1205 TEXAS
AVENUE, LUBBOCK, TEXAS 79401, (806) 744-7667.
```
24
```
PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT
```
25
```
PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
```

*Mechelle Daniel, Federal Official Court Reporter*
*(806) 744-7667*

1                        <u>INDEX</u>

2

3    DEFENDANT'S OBJECTIONS TO PRESENTENCE REPORT............    4

4    DEFENDANT'S SENTENCING EVIDENCE/ARGUMENT................   20

5    STATEMENT BY EMILEE GOLTZ..............................   24

6    STATEMENT BY SCOTT LEECH...............................   27

7    STATEMENT BY LAURA GOLTZ...............................   30

8    ALLOCUTION.............................................   35

9    STATEMENT BY THOMAS LIDDY..............................   41

10   GOVERNMENT'S SENTENCING EVIDENCE/ARGUMENT..............   50

11   SENTENCING FACTORS.....................................   58

12   SENTENCE BY THE COURT..................................   65

13   RIGHT TO APPEAL........................................   68

14   OBJECTION TO SENTENCE..................................   69

15   REPORTER'S CERTIFICATE.................................   70

16

17

18

19

20

21                        *  *  *  *  *

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              THE COURT:  The Court calls the next case of the
 3    morning, United States vs. Frederick Francis Goltz,
 4    5:23-CR-005-1.
 5              Who is here on behalf of the defendant?
 6              MR. KING:  Good morning, Your Honor.  Michael King
 7    appearing with Mr. Goltz.  We're present and ready.
 8              THE COURT:  Thank you, Mr. King.
 9              For the United States?
10              MR. HAAG:  Jeffrey Haag on behalf of the
11    United States.  Ready to proceed, Your Honor.
12              THE COURT:  Thank you, Mr. Haag.
13              Mr. Goltz, good morning.
14              THE DEFENDANT:  Good morning.
15              THE COURT:  I'm sorry?
16              THE DEFENDANT:  Good morning.
17              THE COURT:  Please tell me your full name.
18              THE DEFENDANT:  Frederick Francis Goltz.
19              THE COURT:  Mr. Goltz, you previously appeared
20    before Magistrate Judge Bryant back in late April.  You pled
21    guilty to Count 1 of the indictment charging you with
22    interstate threatening communications, in violation of federal
23    law.
24              Judge Bryant found that your guilty plea was
25    knowing and voluntary and supported by a sufficient factual
```

1  basis, so he recommended that I accept your guilty plea, and I

2  did.  On May 11th, I entered an order accepting your plea, and

3  I adjudged you guilty of the crime alleged in the indictment

4  against you.

5        Now, sir, I know it's the first time you and I are

6  actually seeing each other during this process, but I want you

7  to know I'm very familiar with your case.  The Court has

8  reviewed all these materials, and I'm ready to proceed today.

9  Okay?

10        THE DEFENDANT:  Okay.

11        THE COURT:  Mr. King, have you had an opportunity

12  to read the PSR, its addendum, and its second addendum and

13  discuss those with your client?

14        MR. KING:  I have, Your Honor.

15        THE COURT:  Mr. Goltz, have you had an opportunity

16  to read your presentence report, its addendum, and its second

17  addendum and have a chance to talk about those with your

18  attorney?

19        THE DEFENDANT:  Yes, Your Honor.

20        THE COURT:  You understand we're here so I can

21  decide what sentence to impose?

22        THE DEFENDANT:  Yes, Your Honor.

23        THE COURT:  All right, Mr. King.  You filed

24  multiple objections to the presentence report.  Let me see if I

25  can clear away some of the underbrush.

```
1              There were three clarifying objections regarding

2    certain statements about potential suicidal ideation,

3    children's ages, and CBD gummies.  Those have been adopted by

4    the addendum.  They have no impact.  Those have been rendered

5    moot, I believe.  Is that correct?

6              MR. KING:  That is correct, Your Honor.

7              THE COURT:  All right.  There are two objections to

8    conditions--potential conditions of supervision regarding new

9    credit charges and financial reporting.  I don't intend to

10   impose those, so those are also moot.  Do you agree?

11             MR. KING:  That would be correct, Your Honor.

12             THE COURT:  All right.  You have a clarifying

13   objection about potential immigration consequences.  You agree

14   with the presentence report, but you request inclusion of a

15   statement that he made during rearraignment explaining that he

16   was not conceding he was removable.

17             Probation tells me it should not be included; it

18   has no impact.

19             Would you like to be heard further on that?

20             MR. KING:  Your Honor, I think the objection to the

21   statements--  Paragraph 6 and paragraph 88 are very similar in

22   nature.  Both paragraphs 6 and 88 make a conclusion that

23   Mr. Goltz is removable.  Specifically, paragraph 88 makes the

24   statement he is deportable because he is an aggravated felon.

25             Certainly, Mr. Goltz has not conceded that this
```

1    conviction is an aggravated felon.  The use--that we--  We have

2    employed an immigration attorney.  His conclusion has also been

3    that it's not an aggravated felony.

4         The government, in their response to the

5    objections, has stated that they agree with our objection, with

6    the caveat that Mr. Goltz's immigration status is subject to a

7    separate hearing.  And we agree with that also, Your Honor.

8         THE COURT:  Yeah.  Nothing I do today would bind

9    that separate proceeding.

10        MR. KING:  The concern, Your Honor, is, it is my

11   understanding that the immigration courts can use a--documents

12   from a district court case, to include the presentence report.

13   And there would be nothing that we would want to concede within

14   the immigration--because we understand, after we complete this

15   court--this case in this court, that we will likely find

16   ourselves in front of an immigration judge, and we wouldn't

17   want the immigration judge to say, you didn't object to

18   paragraph 88 where you conceded you were an aggravated felon.

19        THE COURT:  Okay.  Well, my plan--I want to hear

20   from the United States, but my tentative conclusion is to deny

21   your request for a clarification, because the plea agreement

22   and the PSR make clear that no one can predict with certainty

23   the effect of the conviction on immigration status.  I don't

24   think--  I agree with the probation officer; there's not a need

25   to clarify it further.  Clearly, during that separate

1    proceeding, the defendant will say, I don't concede that and I

2    didn't concede that.  And nothing in the PSR or the plea

3    agreement imply such a concession.

4            As far as paragraph 88 and the deportability, I

5    don't think it's necessary for me to resolve that.  I'm not

6    going to say one way or the other.  It's a complex issue, and I

7    don't want to--I don't want to give any indication one way or

8    another of what I think and get out ahead of that.  And so

9    under Rule--Criminal Rule 32(i)(3)(B), I think it's an

10   unnecessary objection.  I just don't plan to resolve it.

11           Am I missing something, Mr. Haag?

12           MR. HAAG:  No, Your Honor.  I think that is an

13   appropriate approach in this case.

14           THE COURT:  Okay.  Well, the clarification--the

15   requested clarification to paragraph 6 is denied, and the

16   objection to paragraph 88 regarding deportability I find is

17   unnecessary to resolve, and it's not going to affect the

18   sentence that I impose today.

19           All right.  There was also a potential--or proposed

20   clarification to paragraph 80 just about the post office box

21   address.  Defendant claims he no longer rents that.  There's no

22   impact on the guidelines here.

23           Would you like to be heard on that, Mr. King?

24           MR. KING:  Your Honor, it is just trying to provide

25   as clear of information as we can to the Court.  I searched

1   LCAD, the Lubbock Central Appraisal District.  It does list

2   this.  I've talked with Mrs. Goltz, trying to figure out why

3   this property is listed.  A Google search of the address shows

4   that that address is a Pack-a-Mail on 98th Street.  That

5   Pack-a-Mail certainly isn't owned by Mr. Goltz.

6          Again, ultimately, Your Honor, it was just to do

7   our best to ensure that all of the facts within the presentence

8   report are true and correct.  Mr. Goltz has no value in any

9   property that is located at that address.

10          THE COURT:  All right.  I'm going to overrule the

11   objection.  The PSR is presumed reliable unless there's

12   evidence rebutting it.  I don't think there's sufficient

13   evidence here.  It's not going to impact anything anyway.  I

14   know the defendant argues he no longer has that P.O. box, but

15   there are indications otherwise.

16          Okay.  Let's turn to your primary objection and one

17   that would impact the advisory guideline range, and that is

18   whether he made more than two threats during this offense.

19   Would you like to be heard further on that?

20          MR. KING:  Yes, Your Honor.  And I'll state for the

21   Court, this is an interesting and complicated issue, one unlike

22   most of my objections to presentence reports.

23          The first objection, Your Honor--well, the first

24   argument within the objection to the more than two threats is

25   that there are many statements that are included within this

1   offense, but those statements do not meet the definition of a

2   true threat.

3            While I've never seen it argued in front of any

4   court, much less decided in front of any court, it would be our

5   position and our argument that the definition of "true threat"

6   includes--is, the more than true threats, that those--the more

7   than two threats, that those more than two threats have to be

8   true threats.  It's not just anything that could be considered

9   threatening.

10           And as the objection to the second addendum

11  explains, the definition of "true threat" has been laid out

12  through case law within the Supreme Court.  In the second

13  addendum to the presentence report, the second addendum

14  incorrectly uses Black's Law Dictionary.  It doesn't go through

15  a process of the subjective and objective requirements of a

16  true threat.  It simply states, well, if something seems

17  threatening or of malice, then it qualifies.  And we would

18  argue for the Court, on a basic principle, that true threats

19  are more defined than what the second addendum attempts to do.

20           Then looking at the second addendum and the

21  response from the government is that all of these statements

22  included are separate threats.  But the government has made the

23  argument that statements can become a threat, or a true threat,

24  by looking at their context.  And then the government has

25  cited--uses other statements that Mr. Goltz has made to explain

1    why that is a threat.

2              And we agree with that proposition.  The case law

3    says, look at the context of the statements.  You can't

4    cherry-pick and pull out this one statement and say, well, it's

5    not a true threat because it doesn't contain all the factors

6    within that statement.  You have to look at the context.

7              Then the government and the second addendum say,

8    well, then, we're going to use these statements that provided

9    context and say that they are additional threats also.

10             Specifically, Your Honor, when you look at the

11   statement of--  One of the posts is that children--"If children

12   are killed, that will burn into the memories of people."  That

13   is certainly a vile statement.  Within that statement, there is

14   no threat.  There's no children that are referenced.  There's

15   no--there's nothing--there's not the specificity required

16   within a threat.

17             Now, we recognize that that statement provides

18   context for the offense to which Mr. Goltz pleaded guilty and

19   that those statements together--somebody has children;

20   murdering children is burned into the memory--we recognize that

21   those statements go together, and that's why Mr. Goltz has

22   pleaded guilty.

23             But what the addendum--the second addendum states

24   and the government states is, well, look at this one statement

25   and look at the second statement; we combine them and make a

 1    threat, and then we're going to separate them and then count

 2    them as two threats.

 3            And it would be our argument that those other

 4    statements--the vile nature of hurting children--that those do

 5    provide the context, but it doesn't--it's not providing an

 6    additional threat.  If you were to look at the initial

 7    statement, then the argument would be that's not a threat.

 8    We've conceded that, in the context, that these are threats.

 9            Additionally, Your Honor, just as--not reading

10    through all of them, but the second amendment lists the

11    statement, "We are in dire need of a real Holocaust this time."

12    Your Honor, that's--it's vile.  It's difficult to say.  It's

13    not a true threat.  There is nobody that has been singled out.

14    The government makes the argument, well, groups can be included

15    as part of a threat, but they have to be identifiable groups.

16            There is not an identifiable group.  Again, the

17    Probation Department was put to the task of identifying which

18    statements were threats, and they listed all of the statements.

19    And, Your Honor, within that list, there are statements--again,

20    the two that I've highlighted for the Court--that our argument,

21    Your Honor, are not true threats.

22            We're not denying that they were said.  Mr. Goltz

23    made all of those statements.  But within the legal analysis

24    from the Supreme Court of what is defined as a true threat, it

25    is our position that those don't meet that definition.

1        Your Honor, the second argument is related to the

2    application note within Section 2A6.1, which limits the conduct

3    that a court is to consider in determining relevant conduct

4    within Section 2A6.1.  And I hesitate to use the term "relevant

5    conduct," because we so often use the definition within 1B1.3

6    for relevant conduct; all acts, omissions, aided, abetted,

7    counseled, committed, induced, procured by the defendant or by

8    co-conspirators.  The application note within Section 2A6.1

9    limits the conduct to conduct that is substantially and

10   directly related to the offense of conviction.

11       I will be honest with the Court again.  I, in my

12   practice, have been aware that relevant conduct, the 1B1.3

13   definition, states that it applies to all of the guidelines

14   unless a guideline provides for a separate definition.

15       This is the first time, to my knowledge, that I've

16   worked with a guideline that says, we are not going to use

17   1B1.3; we are going to provide for a specific explanation of

18   what conduct is to be viewed.  And that conduct that is to be

19   viewed is conduct that is substantially and directly related to

20   the offense.

21       The second addendum doesn't even address this

22   portion of the objection.  The government's response actually

23   demonstrates, in my argument, Your Honor, that the objection

24   should be granted.  The government responds and says that this

25   offense was not an offense as they stated in Count 1 of the

1    indictment; that this offense is an offense against election

2    officials and poll workers in Nevada and Arizona and that this

3    was part of an attempt to counter the election results in

4    Nevada and Arizona.

5              That is not what the government charged in the

6    indictment.  The government has stated, we've charged the

7    specific threat, these specific statements--that's what was

8    pled to in Count 1.  And Count 2 was dismissed.  The factual

9    resumé doesn't state this, threats of an attempt to modify

10   these elections.

11             The government even broadened Section 1B1.3 and

12   goes the opposite way.  We have a limiting instruction from the

13   guidelines, and then the government makes an attempt to make

14   that even broader than what it is.

15             It would be our argument that when you look at that

16   limiting instruction and then what Mr. Goltz pleaded guilty to,

17   that, again, in looking at the spectrum of the threats that are

18   the true threats related to T.L., that that enhancement doesn't

19   apply.  Again, it doesn't diminish the other statements, the

20   vileness, but as applied within the guidelines.

21             THE COURT:  Okay.  All right.  Thank you, Mr. King.

22             Mr. Haag?

23             MR. HAAG:  Yes, Your Honor.  The United States has

24   fully set out its argument in Document 49, and we have

25   identified for the Court the specific statements that, in our

1    opinion, constitute the more than two threats in this case.

2         In order to make that assessment, the Court does

3    have to look at the context of Mr. Goltz' other statements.

4    And when you look at the full context of his other statements,

5    you see the threatening nature of those comments.  And I'll

6    talk just a little bit about three that occurred prior to the

7    threat in Count 1.

8         First is the threat on November 14th of 2022 where

9    Mr. Goltz says, "Hypothetically, a mass shooting of poll

10   workers and election officials in these highly suspect

11   precincts might be the way to go."

12        Second, on November 16th, 2022, he posts this

13   comment:  Maricopa--about Maricopa County Live Meeting, and he

14   states, "Someone should have just walked in and shot them all.

15   They're all trash."

16        Third, when there's a post, "How on earth is it

17   that the people of Arizona could possibly be satisfied with

18   Katie Hobbs as governor," Mr. Goltz posted, "I was thinking

19   more along the lines of a loud boom and brain matter splattered

20   all over the sidewalk, but that's just my guess."

21        And to determine whether this is relevant conduct,

22   you look, is there a substantial connection between all of

23   these threats.  And there is.  The common thread between all of

24   them is, it is threats aimed towards election results in Nevada

25   and Arizona in 2022.

1        Nothing further, Your Honor.

2        THE COURT:  Okay.  I'm going to overrule the

3   objections for the reasons stated by the probation officer, the

4   government, and for the reasons I state today.  I understand

5   your legal arguments.  I do find that there are true threats

6   here, and there are multiple threats here.  The offense

7   involved threats towards election officials and poll workers in

8   multiple locations.  The government points to the defendant's

9   own statements to support, including the following:

10       Again, "Hypothetically, a mass shooting of poll

11   workers and election officials in these highly suspect

12   precincts may be the way to go."

13       Two, the Katie Hobbs statement.  He says, "I was

14   thinking more along the lines of a loud boom, brain matter

15   splattered across the sidewalk."

16       Three, regarding a county official, "It would be a

17   shame if someone got to his children.  There are some crazies

18   out there.  This kind of info shouldn't be readily available on

19   the internet."

20       Four, regarding another county official, "He has

21   got a wife that's a lawyer.  We need to find out her name and

22   where she works.  I don't think he has kids, but I'm not

23   100 percent on that."

24       Five, in response to the statement from another

25   person that kids should be off limits--and again, these

1   statements provide context--"No.  Nothing is off limits.  It's

2   people like you that are supposedly with us who don't have the

3   stomach to do whatever it takes to get our country back."

4           Six, he says, "The children are the most important

5   ones to get, because it sends a message 100 years into the

6   future that people will pay the price for the sins of the

7   father.  Dead children burn into the memories of people.  Dead

8   adults are forgotten much easier."

9           Later statements indicate that these are true

10  threats, including the following:  He says, "Yeah, but when

11  it's me, I'm willing to take lives.  That's the difference.  If

12  you're being unfairly and illegally persecuted, it's built

13  right into the Constitution that you're supposed to protect

14  yourself against a tyrannical government.  This means their

15  children are not off limits either."

16          Again, I find that these are true threats under the

17  current case law.  Just as one example, in *United States vs.*

18  *Murillo*, M-u-r-i-l-l-o, the defendant made two threats directed

19  at a management team where he worked.  It is a Fifth Circuit

20  case from 2000.  The defendant there stated, "If I had a gun, I

21  would Glock out the whole management team."  And in an email,

22  he said he would fix management's wagon for trying to fire him,

23  and "your wagon will get burned."

24          The Fifth Circuit upheld the district court's

25  finding that these were threats under the guideline, warranting

1    the enhancement.

2            And again, here, the defendant has many statements

3    targeting specific individuals and their families, and the

4    threats are much more detailed than the threats involved in

5    *Murillo*.  His additional statements further support that he

6    intended them to be true threats, and these threats occurred

7    during this offense.

8            There's no indication that the guidelines require

9    the threats to be directed at solely one victim, and I disagree

10   with your interpretation of the guideline and its commentary.

11   And moreover, in *Murillo*, the Fifth Circuit upheld the

12   enhancement when that threat was broadly directed at the

13   management team.

14           Finally, although it provides context, it takes a

15   particular amount of chutzpah to argue that calling for a

16   Holocaust is not targeting any particular group of people.

17   Just two days before he made the Holocaust statement--clearly,

18   the Holocaust is a reference to the Jewish people--he said,

19   about a particular American Jewish politician, "I want to throw

20   that Jew in an oven so badly I can taste it."

21           For all those reasons, the objection is overruled.

22           I think that takes care of all of your objections.

23   Am I missing any, Mr. King?

24           MR. KING:  Your Honor, just for the record, there

25   was--the first addendum made a correction to paragraph 85.  We

1  did not object to that, but the first addendum had made that

2  correction--

3          THE COURT:  Okay.  Yeah, and there's no objection

4  from the government about that correction.  Correct?

5          MR. HAAG:  That is correct, Your Honor.

6          THE COURT:  Yeah, and I will accept that in the

7  addendum as well.  Okay.  Thank you, Mr. King.

8          Any objections from the United States?

9          MR. HAAG:  No, Your Honor.

10         THE COURT:  The Court, having resolved all

11  objections to the PSR, its addendum and second addendum, I do

12  adopt them all, their factual findings and legal conclusions,

13  as my own.

14         All right.  Mr. Goltz, thank you for your patience

15  with that.  I am required to resolve all these objections.

16  Both parties get to make whatever they would like, but I have

17  to resolve them before we can proceed.

18         Now that I've done that, I will tell you that your

19  statutory sentencing range, or the total possible range of

20  punishment, is a term of imprisonment of not more than 5 years;

21  a fine of $250,000; and a period of supervised release of up to

22  3 years.

23         Under the guidelines manual, we have a total

24  offense level of 17; a criminal history category of I; and that

25  results in an advisory guideline range of 24 to 30 months'

1    imprisonment.

2            Now, the probation officer notes that there are

3    certain factors here that might warrant an upward departure or

4    an upward variance from that advisory guideline range; in

5    particular, that there are aggravating circumstances that were

6    not taken into account in calculating that advisory range.

7            In particular, the probation officer notes for me

8    that you targeted children in your threatening communications;

9    you posted one victim's personal information on the internet,

10   including that victim's address; and that those circumstances

11   were not taken into consideration in calculating the

12   guidelines.

13           In light of those circumstances, in light of the

14   number of threatening communications, the particularly violent

15   nature of the number of those communications, I have

16   tentatively concluded that an upward variance or an upward

17   departure might be warranted here.  I've not made a final

18   decision on that, and I'll hear both sides out.

19           So, Mr. King, I'm in receipt of your sentencing

20   memorandum.  I understand the arguments within it.  I'm also in

21   receipt of your second sentencing memo, which has the

22   25 character letters and many photos, and the third sentencing

23   memo provides the three additional character letters.  But I

24   would be glad to hear any additional evidence or argument you

25   have on behalf of your client.

1           MR. KING:  Thank you, Your Honor.  And just to be

2     clear with where I am in my procedure, Your Honor, I understand

3     that we have a sentencing memo where we have requested a

4     downward variance.  And if I may, for the Court, my argument

5     for the ultimate sentence and for the downward variance all

6     combine, and if I may just address those at the same time.

7           THE COURT:  You may.

8           MR. KING:  Thank you, Your Honor.  And we also--

9     we've provided notice to the Court.  After my brief argument

10    for the Court, we have three character witnesses that wish to

11    address the Court, and Mr. Goltz also wishes to address the

12    Court.

13          THE COURT:  Okay.

14          MR. KING:  Thank you, Your Honor.

15          The Court has referenced the 25, plus the 3,

16    letters which have been submitted.  I had contemplated, as I've

17    pondered and tried to figure out my best way to present who

18    Mr. Goltz is to this Court, reading each one of those letters

19    to the Court out loud.  They are some of the most thoughtful,

20    heartfelt, insightful group of character reference letters I've

21    put together.

22          Mr. Goltz is magnetic.  People are drawn to him.

23    He doesn't just pass people as he goes by them in the street.

24    People get to know who he is.  The letters from friends and

25    family, they know he's going to be at the games.  They know

1   he's at the volleyball games.  They know he's at the practice.

2   They know he's picking up the kids from school.  They know,

3   when they're out working on their yard, Freddy is walking down

4   to help them work on their yard.

5          When families call up the Goltz family and say,

6   "We're lost; we've been diagnosed with cancer," Freddy doesn't

7   just say, "I'm offering my prayers and concerns."  Freddy says,

8   "I'm going to go and do research," and he does, and he gives

9   that back to the family and provides them hope and love and

10  consolation.  This is just who he is.

11         The letters, time and time again, explain that when

12  kids show up at practice and they don't have what he needs,

13  Freddy goes--not his kids.  Freddy goes and takes care of other

14  people's kids.  He goes to events where his kids aren't even

15  playing and he makes an appearance, and he roots for kids that

16  are not his kids because he loves and supports them.  In the

17  courtroom today are his five children, his in-laws, eight

18  neighbors, five family friends, and his wife.  Every hearing

19  we've had, they have shown up in support.

20         The interesting point of the letter, Your Honor,

21  is, the people who write those letters one-hundred-percent know

22  what Freddy did.  Most of the letters address: I'm embarrassed,

23  I'm appalled, I'm hurt by the things that Freddy said.  It

24  wasn't sugarcoated.  It wasn't glossed over.  But those letters

25  also say, I still know who Freddy is; he is still my neighbor;

1    he's still my dad; he's still my husband; I still love him.  He

2    is still the magnetic personality that they all knew him to be.

3              And then it begs the question, Your Honor, how are

4    we standing here in front of the Court?  Fifty-one years, he

5    has never been in trouble, and for the first time, days before

6    Christmas, he's arrested after dropping his kids off at school.

7    He has missed the first Christmas, and he now stands facing a

8    federal sentencing and possible deportation.

9              Mr. Goltz found himself in a world that we're

10   warned of, in a world that I warn my children of.  He found

11   himself in a downward spiral of this social media echo chamber.

12   It can't be minimized where Mr. Goltz found himself.  And he

13   went from Twitter to Gab, to Gab to--  It continued to go

14   downhill.

15             The Surgeon General has just released a report.

16   And this report targets youth, but youth that spend three and a

17   half hours on social media per day have double the likelihood

18   of having a mental health problem, a mental health crisis.

19   Double.  While that applies to youth, I can't say it wouldn't

20   apply to me also, and I certainly can't say that it doesn't

21   apply to Mr. Goltz.

22             The statements that he said are vile.  This Court

23   has stated them.  I have read them over and over again.  But

24   courts are called, within the 3553(a) factors, to look at the

25   history and circumstances of the defendant.  And when you look

1    at Mr. Goltz, it's overwhelming.  It's hard to understand all
2    that he has done for his family and for his neighbors.  He is--
3    and I won't steal his words, but he is humbly apologetic.
4            The government states in their response that
5    somebody with children should know, and he does now.  He found
6    himself behind a keyboard and behind a screen, and with the
7    false bravado and the anonymity--  He said to me when I talked
8    to him yesterday, "I said things that I never would have said
9    to somebody in person," because that's not who he is.  It's not
10   who he was.  He was wrong.
11           We've asked for a sentence of 12 months and one
12   day.  We've heard that the Court has tentatively considered an
13   upward departure.  It's a very interesting situation where the
14   feelings and emotions are so pulled apart in a case.  I
15   recognize that, again, we have a report of vile things and a
16   heartfelt statement about the guy with the SLR camera who takes
17   pictures of all the kids.
18           We just ask the Court to truly examine those
19   factors about what people had to say about him, recognize that
20   the lesson that has been learned has been learned forever in
21   Mr. Goltz.  Words hurt.  It's a lesson that I teach my
22   12-year-old and my 16-year-old.  You can't say anything you
23   want to online.  He has learned those lessons.
24           We ask the Court to find that that 12 months and a
25   day is sufficient.  Your--

```
 1                  THE COURT:  Okay.  Thank you, Mr.--  I'm sorry.

 2                  MR. KING:  Thank you, Your Honor.  And so I don't

 3       forget, we would request a nonbinding recommendation to

 4       FCI Big Spring.

 5                  THE COURT:  That's granted.

 6                  MR. KING:  And, Your Honor, the first witness that

 7       we would ask to call would be Emilee Goltz.

 8                  THE COURT:  All right.  I will consider all of that

 9       argument, as you have requested, and I'd be glad to hear from

10       Miss Goltz.

11                  MR. KING:  Thank you, Your Honor.

12                  THE COURT:  If y'all would have a seat, please.

13           (PAUSE)

14                  THE COURT:  Good morning.

15                  EMILEE GOLTZ:  Good morning.

16                  THE COURT:  Is it Emilee Goltz?

17                  EMILEE GOLTZ:  Emilee, yes.

18                  THE COURT:  Emilee.  Thank you for being here.  I

19       appreciate it.  Go ahead.

20           (PAUSE)

21                  EMILEE GOLTZ:  I'm sorry.  I'm sorry.  I'm so--

22                  THE COURT:  It's okay.  No apology necessary.  Just

23       take a deep breath.  There's a Kleenex there if you need it.

24                  EMILEE GOLTZ:  So I am my dad's oldest daughter.

25       I've never met anyone who has been so caring and compassionate.
```

1    Like, growing up, always at my games.  Never missed a single

2    one.  If he wasn't there--  Personally, me, I would get annoyed

3    when he'd come, because I--the only person I could hear in the

4    crowd was him.  But if a game went by where my dad wasn't there

5    or he was late or just being quiet, parents, teammates, friends

6    from other schools who knew my dad would come up and, like,

7    they would just ask where he is, because it was so out of the--

8    out of the ordinary that he wouldn't be there for every single

9    game.  And, of course, he's the loudest, because he's just so

10   compassionate and just so involved in everything that we've

11   ever done.

12          I--a bunch of my friends that I still talk to,

13   growing up with--I moved away about four years ago, but I--the

14   amount of pictures and videos that I get of my friends just

15   hanging out at the house.  And I'm, like, oh, like, are you

16   going over there to see my sisters?  Are you going to see my--

17   No, I'm just hanging out with your dad, just hanging out in the

18   garage, catching up on life, because he is one who just takes

19   them in as his own.  He has six kids as it is.  I mean, five of

20   us are here, but--including my friends, my siblings' friends,

21   he has got a lot more than just six kids biologically.

22          He--one of my friends, when we were younger, her

23   parents were going through a really bad divorce, and she was

24   just kind of stuck and just didn't know where to go.  And my

25   dad took her under her wing, and eventually, like, she talked

1   about him as her dad, claims him as her dad, still talks to

2   him, will still call him when she needs help.  She called him

3   when--didn't call me.  Called him when she was stuck in the

4   middle of something that she didn't need to be in and she

5   didn't want to call her parents.  She didn't call anyone else.

6   The first person she called was my dad, because he will drop

7   everything to come and help you out, whether he knows you that

8   well or not.  But if he knows that his kids care about you, his

9   wife, his friends care about you, he will be there no matter

10  what.

11          He--  Breakfast in the morning was always made.

12  Always made us breakfast, every single morning.  If--  I had a

13  friend that got grounded, so she wasn't allowed to drive, so

14  she would be dropped off at my house every morning, and he'd

15  have her breakfast waiting too.

16          He would show up to all of the games, whether--like

17  Michael said, whether we were there or not, if we were playing

18  or not.  If we had friends that he had met through our club

19  teams who played at different schools, he would go and watch

20  their games.  I graduated four years ago, and he was still

21  going to the basketball games even after I graduated and none

22  of us were playing, simply because of the relationships he has

23  made with my former teammates and their parents on the team.

24          It's unfortunate that y'all only know him from

25  what's on paper.  It's very unfortunate, because if y'all had a

1    chance to meet him personally, you would probably be best

2    friends.  He would care for you like he cares for everyone else

3    in his life.

4              And, Dad, I love you.  So dumb, but I still love

5    you.  And I'm sorry.  That's all I have to say.

6              THE COURT:  Okay.  Emilee, thank you for being here

7    today.  You're lucky your--I'm sorry--your father is lucky to

8    have a daughter like you who's willing to come and speak on his

9    behalf.  So I appreciate it, and I will take all that into

10   consideration.

11             EMILEE GOLTZ:  Thank you.

12             THE COURT:  All right.  Mr. King, who is next?

13             MR. KING:  Thank you, Your Honor.  Scott Leech.

14        (PAUSE)

15             THE COURT:  Good morning, Mr. Leech.

16             MR. LEECH:  Good morning.  How are you doing?

17             THE COURT:  Good.  Is it L-e-a-c-h?

18             MR. LEECH:  L-e-e-c-h.

19             THE COURT:  I'm sorry?

20             MR. LEECH:  L-e-e-c-h.

21             THE COURT:  L-e-e.  Okay.  Thank you.  Go ahead,

22   sir.

23             MR. LEECH:  I've got a letter here--I've got a

24   letter here, because if I don't read, I'll forget everything,

25   so--

```
1              THE COURT:  All right.

2              MR. LEECH:  Your Honor, I'm Freddy's friend,

3    neighbor, and former business partner.  I'm here today to let

4    you know a little bit about the Freddy that I've known for the

5    past 14 years.

6              First and foremost, Freddy is a family man.  He and

7    his wife Laura have been married for 24 years, and together,

8    they have five children together, ranging in ages from eleven

9    to twenty-two years old.  As you've heard earlier, Freddy is

10   very involved in all the daily activities of his family.  He

11   and Laura take the kids to school in the morning, they pick

12   them up in the afternoon, and as Emilee just said, if there's

13   an after-school sporting event, he always makes it to the

14   games.

15             In the evenings, you can usually see him outside,

16   shooting hoops with his youngest son J.G. or playing volleyball

17   with his girls and their friends, or just simply grilling out

18   for everybody.  Freddy has always been such a huge part of our

19   neighborhood and our community.  Most people put a fire pit in

20   their back yard, but not Freddy.  He put one in his front yard

21   to welcome all his friends and neighbors over.  If the fire is

22   going, there's never a need for an invitation; just go on over.

23             He's always looking out for his family and friends,

24   especially kids.  I'm talking about everybody's kids.  I've

25   actually coached with Freddy and I've seen how good he is with
```

1    children and how they respond to him.  I've seen a guy who is

2    extremely passionate about life, with tons of charisma, who

3    loves his family.  He puts one-hundred-percent effort into

4    everything he does.

5            Freddy has a very energetic and fun personality.

6    In these past 14 years, I've never ever seen him be violent.

7    I've never seen him get into any type of physical altercation

8    with anyone.  Before this particular incident, he has had a

9    clean record for 51 years.  The Freddy that I know is not and

10   has never been a risk to himself or to others.  I know that he

11   would never ever again put his family or his freedom in

12   jeopardy, and I know that all, right now, he wants to do is be

13   reunited with his family.  I pray that day comes sooner than

14   later.

15           And I know the--I know that it has kind of been

16   made out like he's some type of monster.  He is not.  If you

17   knew this guy, he is a stand-up guy.  I've lived right across

18   the street from him for the past 14 years.  Some of the stuff

19   that was said, I think the bark is bigger than the bite.

20   Sometimes you get down a rabbit hole, with COVID and not--too

21   much time on your hands.  He's a staunch Republican, and

22   sometimes things get taken a little too far, and sometimes way

23   too far.  But I just hope that you show him mercy.

24           THE COURT:  Okay.

25           MR. LEECH:  Thank you.

```
 1                    THE COURT:  All right.  Mr. Leech, thank you for
 2       being here.  I appreciate that.
 3                    All right.  Who is next, Mr. King?  Last one.
 4                    MR. KING:  Thank you, Your Honor.  Yes, the last
 5       one.  Mrs. Goltz.
 6                    THE COURT:  Good morning, Mrs. Goltz.
 7                    LAURA GOLTZ:  Good morning.
 8                    THE COURT:  Will you tell me your first name,
 9       please.
10                    LAURA GOLTZ:  Laura.
11                    THE COURT:  Thank you.
12                    LAURA GOLTZ:  Laura Goltz.  Freddy and I--  I'm
13       Freddy's wife.  And I do have paper, too, because I'm not good
14       at this.
15                    Freddy and I have been married for 24 years, and we
16       have five children together.  And again, we just want you to
17       know the Freddy that we know and share a little bit about who
18       he is as a person, not who he was or who--the words that he
19       used online.
20                    As said, from the early days of our marriage,
21       Freddy's heart was always evident.  The company that I worked
22       for at the time was a big supporter of Elf Louise in
23       San Antonio.  And Elf Louise, they do Christmas gifts for
24       underprivileged kids.  We were assigned to a section downtown.
25       Freddy and I went.  We got our bag of gifts.  Freddy pulled on
```

1    his Santa suit, we hopped in the car and away we went.  Had no

2    clue what to expect.

3           When we got to the apartment complex and pulled in,

4    all the kids came running.  And Santa Freddy got out of the car

5    and sat and talked.  We had a bag--one bag of gifts.  Every kid

6    that was there, Freddy sat and talked to.  When we ran out of

7    gifts, he still sat and talked to them.  What should have been

8    a two-hour tour--or two-hour delivery took us over five hours,

9    just because Freddy took the time to sit, talk, and encourage

10   all of these kids.

11          When we moved to Midland, Freddy was at--I think it

12   was Wal-Mart.  Freddy can talk to anybody.  And he was talking

13   to a gentleman at Wal-Mart and found out that he was a vet and

14   he was in town for the Show of Support hunt.  Freddy started

15   asking questions, asking questions, well, what about this, what

16   about that.  He's, like, it's a perfect opportunity.  He

17   volunteered every year for that hunt when we were there just so

18   that he could sit and talk to people and understand them, one

19   on one, talk to people face-to-face.

20          When we moved to Lubbock, that's when the kids

21   started sports, and Freddy jumped in.  He coached football,

22   basketball, and baseball when they were younger.  And when they

23   outgrew his coaching acumen, he became the team dad.  He was at

24   every event, and he's loud.  My Lord, is he ever loud.  I have

25   to sit on the other side of the gym from him.  But he's there

1    so he can support those kids and the coaches.

2            Freddy is the dad that drives behind the bus when

3    they're driving to--50-mile-an-hour school bus between here and

4    Dallas, to make sure--or here and Bastrop, here and wherever,

5    to make sure--follow the bus.  If anything happens, he wants to

6    be there.

7            At one of the tournaments in Dallas--it was a big

8    basketball tournament.  Freddy was--he goes and talks to

9    everybody.  He went in and noticed that there were no fans in

10   the stand for these poor girls that were out playing.  So

11   Freddy stayed, watched every one of their games, learned all of

12   their names, had signs--went and made signs, and by the end of

13   the tournament, half of the girls from our team were part of

14   that team, cheering in the stands.

15           He's a loyal and caring friend, and he selfishly

16   supports those going through hard times, offering a helping

17   hand and listening.  When our neighbor who is here today was

18   going through a terrible divorce and was--Freddy, every night,

19   would put the kids down and go and stay with Pete so he wasn't

20   by himself.  That's just what Freddy is.  That's what Freddy

21   does.

22           Another friend fell upon hard times, didn't have a

23   place to live.  Freddy took our RV, drove it to the RV park,

24   paid all the lot fees, put groceries in the RV so he had a

25   place to stay so that he wouldn't have to leave town, knowing

1  that his kids--this is where his kids were growing up.

2          He's always been a straightforward person, I mean,

3  to his kids, and, like Emilee said, even--I mean, anytime those

4  kids had a hard time, they knew who to call.  They would call

5  Fred all hours of the day, morning.  He would go and get them,

6  bring them back.  They knew that there were consequences.  They

7  were going to have to tell their parents.  But they knew that

8  they had a safe person to call.

9          Oh, and he's very--or he's very involved in our

10 neighborhood.  Our neighbors moved in down the street--or our

11 next-door neighbors moved in maybe seven, eight years ago, and

12 they let Freddy know, hey, we're going to be out of town for

13 the weekend.  We live on a cul-de-sac, and they live at the end

14 of the cul-de-sac.  Well, Freddy noticed that there was a

15 strange car down there, so he gets on the golf cart, drives

16 down, and he's--who are you? Nice to meet you.  Come to find

17 out, it was his--it was our neighbor's mom.  She was a little

18 offended at first, but she realized that he's just there to

19 protect their family.  I think he actually did the same thing

20 to Joel's dad, as well, when he showed up.

21          But he--yeah, I--and very caring.  Our neighbor

22 Linda is a cancer survivor.  Her husband Lotty [phonetic] is a

23 retired B-52 bomber.  They are older, but they love to do

24 things in their yard.  Linda loves to plant.  Lotty will drive

25 up with a trailer full of bags of sod.  Freddy helps back the

```
 1   trailer in and he's there to help them pull everything off the
 2   trailer.  He does not let Linda get up on a ladder.
 3           Bobby, our other neighbor, he's constantly helping
 4   him with the horses.  He's very--a very, very caring person.
 5           I don't know why Freddy wrote the things he did.
 6   That's not who Freddy is.  He's not out organizing political
 7   rallies or functions or anything like that.  He's organizing
 8   where the kids are going to eat dinner before Belles and Beauxs
 9   dances.  He's organizing where are we going to take pictures,
10   how are we going to do this for our friends and neighbors.
11           The past few years, it's been physically and
12   mentally tough on everybody.  In these challenges, sometimes
13   you just need a release.  I don't know if this was his release,
14   but I know that that's not who he is.  And I hope that you can
15   take the time and you've listened and you've read the letters
16   and understand who Freddy is as a genuine person.
17           He has got a huge heart for others, full of
18   compassion and dedicated to his family, friends, and community.
19   I just ask that you give him a chance and allow him to learn
20   from these mistakes and grow as an individual and make the best
21   out of a bad situation.  Thank you.
22           THE COURT:  All right.  Thank you, Mrs. Goltz.  I
23   have listened, and I appreciate you being here.
24           LAURA GOLTZ:  Thank you.
25           THE COURT:  All right, Mr. King.  Your client would
```

1    like to make a statement?

2              MR. KING:  Yes, Your Honor.  Thank you.

3              THE COURT:  All right, Mr. Goltz.  You do have the

4    right to tell me anything you'd like to tell me.  It sounds

5    like there is something you'd like to say.  Go ahead.

6              THE DEFENDANT:  It's going to be tough.

7              I don't want to get into relitigating all these

8    points that they go back and forth on.  My lawyer says things

9    that I scratch my head at sometimes, but I know it's how you

10   guys do things here in the court.  And I scratch my head at

11   some of the things the prosecutor says about my statements, but

12   I know it's how you guys do things here in the court.  And when

13   I bring my car to the mechanic, I don't sit over his shoulder

14   and tell him what to do, so I just sort of throw my shoulders

15   up in the air and let them do their thing.

16             But the only thing I want to say about a lot of

17   those comments, however vile they may be, is that I heard the

18   word "context" a lot, but nobody ever went down the rabbit hole

19   of context.  I'm not saying all of those are innocent comments,

20   but what I am saying, a lot of them--for example, the--  Okay.

21   I've been a writer for 25 years.  That's why I quit playing

22   hockey.  I write--I write over-the-top comedies, comedy

23   sketches, teleplays, TV pilots.  That over-the-top energy is

24   what I take with me everywhere.

25             The first headline after I was arrested was the one

1   that referenced the antisemitic Holocaust; in effect, rendering
2   a 25-year body of writing work completely useless.  It's a
3   paperweight now, and that's fine.  That's fine.  Nobody ever
4   asked why I said that.  It was a digital tongue-in-cheek
5   response to a gay Jewish professor at a university who had
6   called for the eradication of heterosexual males, something
7   ridiculous of that nature.  So I responded ridiculously in kind
8   with, "We need another Holocaust," I mean, never knowing those
9   words would come back to bite me as they did.  And that's all
10  I'm going to say about the kind of context that--and the
11  intellectual dishonesty that some of those appear to have been
12  presented in.

13          But other than that, you know, my wife said, you
14  know, we've been married for 24 years, and we've been together
15  since '95, almost three decades.  And I think the longest I've
16  been away from her is six days.  That happened one time back in
17  the nineties.  This entire past eight months or so has just
18  been a complete shock, a surreal experience that I'm still--
19  just to be here in a yellow jumpsuit and shackles in front of a
20  federal judge and my family, my neighbors, it's unbelievable.
21  And when I say that, I mean it's literally not to be believed.

22          Everything about my life that they were talking
23  about, I love doing it.  I love sharing all that with my wife,
24  from getting up early in the mornings, making breakfast, to
25  tag-teaming the lunches, to get the backpacks ready for the

1   day, to get the kids' teeth brushed and get them off to school

2   and enjoy that 15 minutes of a captive audience that I have

3   with them on the way there and then get that 15 minutes again

4   on the way home.  I love all of that.

5           The things I said were just idiotic and reckless

6   and stupid.  Some of them came from frustration.  Some of them

7   came, like I said, tongue-in-cheek.  But combined, they--I--in

8   the magistrate judge's court, I heard them reading those all

9   off.  I mean, to combine 20 comments from tens of thousands, I

10  was starting to question myself when he reads them all off in a

11  row.  They're horrible.

12          There's been some good come of the last

13  three-quarters of a year, I guess.  I tend, in these times, to

14  see nothing but the negative, but my wife tends to see the

15  positive, no matter what, in things.  And she reminded me of

16  one of the most positive things.  I mean, the last year has

17  been pretty humbling, for sure, but--or eight months.  But the

18  most humbling thing probably started the day of my arrest,

19  actually, and I didn't find out till later.  But, you know,

20  it's when people start--shortly after school got out, people

21  start showing up at my house.  Neighbors and, you know, old

22  business partners and new business partners, friends, even

23  teachers.  I don't know how they heard so fast, but, you know,

24  kids from the neighborhood would roll up on golf carts to take

25  my daughters on golf cart rides to take their mind off their

1    dad getting arrested.

2          And, you know, just three days after that, a couple

3    of volleyball moms show up on a Friday to take my kids away for

4    weekend sleepovers so that my wife could wrap her head around

5    the chaos and prepare for the legal fight that was going to

6    happen and the financial burden that was going to place on us

7    with five kids and two in college, you know.

8          And to have those people in your life, I didn't

9    really know I had--I didn't really realize that I had that

10   support and that kind of loyalty from my friends.  And when my

11   wife mentioned that--  You know, I truly feel blessed to have

12   those people in my life.  And some of them are here right now,

13   and if I have embarrassed them or hurt them in any way, I

14   apologize.

15         THE COURT:  All right.  Thank you, Mr. Goltz.  I

16   appreciate that statement.  Is there anything else about this

17   case?

18         THE DEFENDANT:  Well, yes, I would like to, you

19   know, address something else.  You know, it brings me to

20   Mr. Liddy, who is here today to give his testimony, too, and

21   can't blame him for that.  But it doesn't detract from the fact

22   that I owe him an apology.  And when I was thinking about what

23   I was going to say and how I wronged him, there were some

24   pretty striking parallels to, you know, what's happened to me

25   since my arrest.  And I don't know if that's karma or just

1    desserts or whatever it is.

2              But, you know, the first thing--the very first

3    thing that I could think of was the video, the famous video

4    that was being commented on and shared.  And when I was

5    thinking about it, it wasn't even a full video.  It was a clip

6    of a video.  To my memory, it was part of a phone call, which

7    means we didn't see anything that led up to it.  We didn't hear

8    anything of the conversation.  We don't even know who made the

9    call, and, you know, that's out of context.

10             And I know something about being taken out of

11   context, but usually, I'm the kind of guy that I'm--I'm a

12   skeptic, and I would say, well, listen, you know, let's step

13   back here; where's the rest of the phone call; you know, who

14   made the call; what was said before that.  But for whatever

15   reason, I didn't.

16             So I apologize for that aspect of it, which, you

17   know, right after that, right after I finished watching the

18   video, I clicked into the comments section and, I mean, he was

19   already deluged with all these comments and people sharing

20   personal information and whatnot.  And again, I just read a

21   couple dozen comments, saw the tone, and just threw stuff

22   against the wall to see what would stick and--when I should

23   have been taking a step back and, you know, saying, well, where

24   is this guy; why can't we hear from him, you know, about what

25   this is about; you know, we're jumping on this guy; we're

1   dog-piling him, you know, without him being here to defend

2   himself.  And just to dog-pile somebody like that is pretty

3   gutless, you know.  And so I--that's the second thing I

4   apologize for.

5          But, you know, the thing that really struck me was,

6   when I was first arrested, I'm sitting in a jail cell, and I

7   was already under water, you know, my head spinning, and it was

8   a very desperate time for me.  And I knew that my immigration

9   was in jeopardy, so my family was in jeopardy.

10          And on top of that, at nighttime, when it was bed--

11   when I should have been putting my kids to bed, locking the

12   doors and whatnot, all I could think about was, what if

13   something happened.  What if somebody tried to break in, or

14   what if there was a fire, you know, and I wasn't there because

15   of the stupidity that I displayed.  And if I imparted even a

16   fraction of that despair on Mr. Liddy and his wife, I truly

17   apologize for that.

18          And I understand that, you know, Mr. Liddy has

19   probably received a lot of mail and harassment on that video,

20   and one little apology from me isn't going to go a whole long

21   way.  But maybe if they see the things that I did wrong, they

22   won't be so quick to repeat it with other people, and possibly

23   maybe even rethink their views on that video itself.  I hope

24   that Mr. Liddy sees my apology as genuine and self-reflective

25   and deeply remorseful.

1        I'm just very thankful that nobody got hurt.  And

2   after today, I hope that he and I both can just throw this in

3   our wake and never revisit it again.  And I truly wish him his

4   best life, and I'm going to try to live mine.

5        THE COURT:  All right.  Thank you, Mr. Goltz.

6        Okay.  There were no--nothing else from the

7   defense?

8        MR. KING:  Nothing further, Your Honor.

9        THE COURT:  Okay.  All right.  Why don't y'all have

10  a seat.

11       MR. KING:  Thank you, Your Honor.

12       THE COURT:  Mr. Haag?

13       MR. HAAG:  Yes, Your Honor.

14       Your Honor, we have one victim, the victim in

15  Count 1, Thomas Liddy.  He would like to make a statement to

16  the Court, please.

17       THE COURT:  All right.

18   (PAUSE)

19       THE COURT:  Good morning, Mr. Liddy.

20       MR. LIDDY:  Good morning.  Thank you, Your Honor.

21       THE COURT:  Thank you for being here.

22       MR. LIDDY:  I greatly appreciate the opportunity to

23  be here.  I know a lot of victims across the world don't get

24  this opportunity.  And even in other states, people don't get

25  this opportunity.  But we do here as part of what a wonderful

1    country we live in.  And I drove over 700 miles to be here, and

2    as soon as this proceeding is over, I'll be headed back to

3    Phoenix, you know, where my kids are.

4            I guess I want to start by just thanking you, Your

5    Honor, and thanking this Court, and I want to thank the

6    U.S. Attorneys, Assistant U.S. Attorneys and the marshals and

7    the FBI Special Agents, specifically from the Dallas field

8    office and the Phoenix field office, for doing everything that

9    they have done specifically to protect me and my children.

10           It was a pretty heavy day at work when the FBI

11   shows up, wants to see my boss and calls me upstairs and says,

12   Mr. Liddy's life is in danger and his children's lives are in

13   danger.  "Context" has been mentioned here.  Context is

14   everything.  Context is everything.

15           I had four pieces of body armor issued by Maricopa

16   County to my children to protect them during the holidays,

17   Thanksgiving and Christmas.  That's how serious the threat was.

18   And at the time, they didn't know who made the threat, but they

19   knew that the nature of the threat was out on the dark

20   internet, soliciting the murder of me and my four children.

21           Of course, the address--the dox--the address that

22   was given was an address of our home for fifteen years that I

23   had sold nine years previously.  The first thing I did was

24   ensured that the Chandler Police Department was notified, that

25   the two children that live in that home that you dox'd whose

1   lives were in danger were protected.

2          He said what he said.  Context is everything.  Why

3   me?  That's why, Your Honor (indicating).  That's why.  I'm a

4   deputy county attorney, a chief, Maricopa County Attorney's

5   Office.  My job is to give legal advice to every portion of

6   government in Maricopa County, the fourth largest county in the

7   United States; flood control, public health, limited power of

8   government.

9          It also includes elections.  In elections, we have

10  a recorder, and we have a board of supervisors that has a

11  department of elections.  I advise them on how to run the

12  elections, and I defend them if they're challenged.  Why me?

13  Because I've been involved in elections my entire life.  My dad

14  ran for Congress in 1968 in the 20th District of New York

15  State.  When I was eighteen years old, the first thing I did

16  was sign up for the draft.  The second thing I did was

17  volunteer to work on Ronald Reagan's campaign.  And I did that.

18  Very proud to have done that.

19          I've been involved in elections my entire life.  I

20  served as an infantry officer in the second--third battalion of

21  2nd Marine Division, and I was the battalion elections officer.

22  That's how much I care about elections.  I was the deputy

23  counsel for the Republican National Committee from 1995 until

24  1998, working on, among other things, elections.  So when

25  Maricopa County got the opportunity to have me advise them,

1    they took it.  I've been doing that for 15 years.

2            That's really what this is all about, Your Honor.

3    The rubber meets the road right here, Lubbock County, Texas, in

4    your courtroom, people challenging our democracy.  Ironic that

5    a few days after the Constitution was written, even before it

6    was ratified, Benjamin Franklin said to a patron of

7    Philadelphia, "Congratulations, we've got a democracy if we can

8    keep it."  Well, it's been a trying three years, I can tell you

9    that.

10            Now, when this threat went out against me, there

11   were several things I thought about.  "Context is everything,"

12   one.  "Hey, maybe a big boom; maybe a big explosion, brains all

13   over the sidewalk."  Well, been there done that.  March of

14   2021, while I'm writing an appellate brief defending the 2020

15   election, law enforcement took me out of the building because

16   of a bomb threat right in front of my building.  Of course, I

17   was able to finish the brief by moving to an interior office

18   with my colleague and get it done, because I will not be

19   intimidated.  Not in '21, not in '22, not in '23, not ever.

20   Not ever.  I will not be intimidated.

21            But this threat was not a threat just to me.  It

22   was a threat to my four children and, necessarily, my wife as

23   well.  My four children are dynamic people too.  My oldest

24   child is a writer.  She writes screenplays.  She writes pilots

25   for television.  She writes short stories.  She's been

1    published.  People are drawn to her.  She makes people laugh.

2    She makes people think.  And, right now, she's in the legal

3    office of one of the largest corporations in the world

4    defending the rights of other creative people and their music

5    in their legal department.

6              My second daughter whose life was threatened was

7    serving as a lieutenant in the United States Air Force.  And I

8    was that dad running around at all the cross-country meets and

9    the swimming meets with a camera too.  I knew the names of all

10   of my children's teammates as well.  She did very well in

11   cross-country, extremely well in her academics, and she got

12   appointed to the United States Air Force Academy.  And she was

13   stationed over 2,000 miles away from her home, looking forward

14   for an opportunity to see her brothers and her sisters again.

15             When she came home for Thanksgiving, there were

16   armed guards around our house, and she was issued body armor.

17   Welcome home, Lieutenant.  By the way, if you come into the

18   house or out of the house, you have to check in with security.

19   We had armed guards to the north and south of our home 24 hours

20   a day.  That's context.

21             Calling for a Holocaust.  Oh, I'm T.L., by the way,

22   Thomas Liddy.  I don't care if people know my name.  I'm proud

23   of it.

24             One of my clients, S.R., he has been the

25

1  recipient of all kinds of abuse, because he's the recorder in

2  Maricopa County.  He has a huge job related to the elections,

3  not the least of which is making sure everyone's registration

4  is up to date, something that happens every single day and, of

5  course, in early voting.  He's a Jew, a Jewish American.  Had

6  to listen to that filth.  He's my client.  It affected me.

7           Another thing mentioned:  Oh, one of the other

8  public officials involved in elections--that would be the

9  chairman of the board--he has a wife that's a lawyer.

10          His wife is a judge.  A judge's life was threatened

11  too.  So it's not one person whose life was threatened.  This

12  particular charge, the one that remains, is a minimum of six.

13  Mine, my four children, my wife, not to mention the family that

14  lived in the home in Chandler, Arizona, whose lives were

15  threatened as well.  That's some serious stuff.  It's all about

16  context.

17          I feel like I owe this to the defendant, Your

18  Honor.  I've worked in election law many, many years, since

19  1995.  I'm really good at it.  Usually I represent Republican

20  candidates, but for the last over a decade, I've represented

21  government, Maricopa County.  And so in the 2022 election

22  cycle, there was one race that was very close.  That was for

23  Attorney General.  The Democrat defeated the Republican by

24  281 votes.  This is--this is a county with almost 3 million

25  votes.  Very, very close election.

```
 1              So, naturally, there was an election challenge, and
 2   I'm working every day.  I'm--there were several election
 3   challenges, and a phone call came in to me from a lawyer whom I
 4   know, and he had some questions about this election and
 5   questions about the gubernatorial election, which was not as
 6   close.
 7              So I called him back on my phone.  I made the call
 8   to the other individual.  And he asked a series of four
 9   questions, all of which were very vanilla in election law: how
10   many provisional ballots were there; how many over-votes; how
11   many under-votes; how many ballots were not able to be counted
12   and, therefore, need to be duplicated.  This is the sort of
13   thing that, in a normal election contest, is done.  There's
14   nothing unusual about it.
15              But then another person came on the phone and said
16   to me this:  "We're going to need these answers very quickly,
17   Mr. Liddy, very quickly.  There's a lot of people out there
18   that are angry that want to take to the streets that we can't
19   control, and I'd hate to have to tell them that Thomas Liddy
20   wasn't cooperative."
21              Well, I knew what that was.  That was a threat.  I
22   told him I wasn't intimidated by it.  He said, oh, I'm not
23   threatening you; I'm just--I'm just worried about your safety.
24              And I said, I don't give a foxtrot what you're
25   worried about.  You've got questions for me?  You ask them and
```

1 I'll do it.

2    That was a 12-minute conversation.  Two minutes of

3 that was sent out on the internet by somebody else, and they

4 put up words on that that said, "Tom Liddy is not being

5 cooperative," exactly the threat that was made.

6    The defendant was manipulated, Your Honor.  He was

7 manipulated.  Ironically, in a sense, he's a victim too,

8 manipulated by a large group of people that are trying to

9 degrade the confidence that people in this country have in

10 their elections.

11    And I want to say one more thing, Your Honor.  I

12 heard today in this courtroom that the defendant has an

13 11-year-old child.  I presume he may be in this courtroom.

14 Well, on January 23rd, 1973, I was a 10-year-old child.  My

15 father was sentenced to 20 years in prison.  I didn't get a

16 chance to say good-bye to him.  He went straight from the

17 U.S. Marshals to prison.

18    No one in this room knows the damage that can do to

19 a child except me.  Tough on my sisters, tough on my brothers

20 too.  It's going to be very, very tough on this family.  The

21 last thing that I would ask you, Your Honor, is the last thing

22 that you think about before you impose sentence on this

23 defendant is not the defendant, not me, not even the lives of

24 my children, but the real impact that a significant sentence

25 will have on the defendant's children; specifically, his

1    11-year-old son.

2          I can look you in the eye, Your Honor, and promise

3    you that any benefit that would come to putting this defendant

4    in prison for 5 years is far, far, far outweighed by the harm

5    it will do to that 11-year-old boy.  It's something that we

6    don't pay attention to much.  We think about preventing crime

7    by incarcerating people.  We think about deterring crimes for

8    incarcerating people.  And I believe in all that.  But we have

9    to remember the impact it has on the children.

10          Now, this crime was a crime calling out

11    solicitation for violence.  Very real.  Impacted me and my

12    children considerably.  One of my children, by the way, is a

13    prosecutor, a lawyer.

14          And I want to thank this Court for changing the

15    date of this proceeding, because my fourth child just graduated

16    high school, is an honor student, and I'm driving him to

17    South Bend, Indiana, to college next week, when this originally

18    was going to be.

19          I care about my children deeply, deeply.  Their

20    lives are precious, as are the lives of the defendant's.  But

21    their lives aren't in jeopardy.  But the psychic damage that

22    can be done to the young children behind us can be enormous,

23    enormous.  And I ask you to bear that in mind when you

24    contemplate going to the upper level or the lower level of the

25    recommended sentence.  I personally, Thomas Liddy, T.L., the

1    victim, will not be offended if you take into account these

2    children and sentence him to the lower level.

3            Thank you, Your Honor.

4            THE COURT:  Thank you, Mr. Liddy.  Mr. Liddy,

5    victims often don't come to speak.  They have a statutory right

6    to speak in federal court.  I know that you came a particularly

7    long way to share those thoughts with me, so thank you for

8    taking the time and traveling those miles to do it.

9            MR. LIDDY:  Thank you for the opportunity, Your

10   Honor.

11           THE COURT:  Mr. Haag, were there any other victims

12   that wanted to speak today?

13           MR. HAAG:  No, Your Honor.

14           THE COURT:  Okay.  Go ahead.

15           MR. HAAG:  Yes, Your Honor.

16           As a procedural matter, I would ask the Court to

17   dismiss the remaining count and proceed to sentencing on

18   Count 1.

19           THE COURT:  That's granted.

20           MR. HAAG:  Your Honor, I want to address two

21   3553(a) factors here today.

22           The first factor that I want to discuss is the need

23   for deterrence.  This Court has heard the statement of

24   Mr. Liddy, and I want follow that up with a portion of S.R.--he

25   is the victim in Count 2.  I want to follow up with a portion

1    of his victim impact statement, because I think he so

2    eloquently captures why the need for deterrence is paramount in

3    this case.  S.R. writes:

4            "While I am the person directly threatened in

5            this case, the impact of such threats is felt by a

6            much larger community: the thousands of committed

7            election workers who operate our democratic

8            processes.  These election workers are our

9            neighbors, our friends, our family, and our

10           co-workers who, irrespective of their personal

11           beliefs or political affiliations, take time out of

12           their busy schedules to join us for a few days,

13           weeks, or months at a time.

14           "When threats are made against any election

15           workers, the impact reverberates through the whole

16           community.  It creates an atmosphere of fear and

17           apprehension.  If those who step forward to serve

18           their community, typically an older demographic,

19           are concerned about intimidation or threats, it

20           could discourage them from participating in future

21           election cycles.  This potential chilling effect

22           not only threatens the robust functioning of our

23           electoral processes, but it also strikes at the

24           heart of our democracy.

25           "In Arizona, we have already seen the impact

1          of such pressures on our election community.  Over

2          the past two years, seven of the fifteen elected

3          county recorders have prematurely left their

4          positions.  Beyond leadership posts, we have seen a

5          significantly higher turnover rate for our

6          staff-level positions as well."

7               As Mr. Liddy and S.R. so eloquently comment, Your

8     Honor, the need to deter people from undermining the election

9     process cannot be overstated.

10               The second factor that I'd like to discuss, Your

11    Honor, is the need to reflect the seriousness of the offense

12    and to provide a just punishment.

13               I have struggled in all of my writings to capture

14    just how vile and abhorrent the threats in this case were.

15    When a child is born, the parent takes on that mantle of

16    responsibility for the safety of that child, and that becomes

17    the parent's greatest responsibility.  Conversely, failing the

18    child in that becomes a parent's greatest nightmare.  It's what

19    keeps parents awake at night.  And the fact that the defendant

20    would play upon that fear is inhumane, vile, and repulsive.

21               I want to thank Mr. Liddy for giving a visceral and

22    powerful statement about the real-life consequences of the

23    threats the defendant made in this case.  I cannot, in my

24    wildest dreams, imagine putting body armor on my children.

25               Your Honor, I ask the Court to impose a sentence in

1    this case that accounts for the need for deterrence and the

2    need to reflect the seriousness of these truly horrific threats

3    and provide a just punishment for those threats.  Thank you.

4            THE COURT:  All right.  Mr. Haag, one second.  And

5    I'll hear from Mr. King on this too.

6            I hesitate to award a three-level reduction for

7    acceptance of responsibility in light of the defendant's own

8    statements today.  He--  There were a lot of excuses.  There

9    were allegations that we didn't look at enough context; we just

10   don't understand; it's just his over-the-top writing; "I always

11   write that way"; "I just took that digitally with me"; "It's

12   just my style"; "This was tongue-in-cheek"; "This was digital

13   tongue-in-cheek."  There was an allegation of intellectual

14   dishonesty, and then, ultimately, he just said it was reckless.

15           He has, under oath, admitted that he knowingly sent

16   or transmitted communications containing a threat to injure the

17   person of another, that he transmitted it with the purpose of

18   issuing a true threat, and that it was sent in interstate or

19   foreign commerce.

20           I'm having a lot of difficulty squaring that sworn

21   factual statement with what he told me today in his opportunity

22   to address the Court.  And he can say whatever he wants.  I

23   understand that he has pled guilty and that he saved the

24   government the trouble of a trial.  But acceptance of

25   responsibility is a three-level reduction--assuming the

1    government moves for the third, which it has in this case thus

2    far--in recognition of the societal benefit from someone

3    saying, I was wrong and I truly and fully accept

4    responsibility.

5            And I didn't see any of that today.  To the

6    contrary, I saw defiance and excuses.  But I don't do that

7    lightly, and I wanted to get your--and I'll allow Mr. King as

8    well.  But the defendant's own words here cause me concern to

9    not award something that's just not justified.  Does the

10   government have a position?

11           MR. HAAG:  Yes, Your Honor.

12           The allocution was puzzling, Your Honor.  I could

13   not make sense of what he was talking about and why he would--

14   why he would try and pass those comments off, which are clearly

15   threats, as anything other than threats.

16           That being said, I don't think he said with

17   sufficient clarity that the statements in Count 1 should not

18   have been taken as threats; they were taken out of context; I

19   didn't mean them like that.  I think if he had addressed

20   Count 1 specifically and the statements in Count 1, then I

21   think there would be grounds for removing acceptance of

22   responsibility.

23           But I will give the benefit of the doubt and assume

24   he was talking about the other comments that were made in other

25   series of threads and that those were taken out of context.

 1    And if you give him the benefit of the doubt and he wants to

 2    explain those, I don't think it would require removing

 3    acceptance of responsibility.

 4              THE COURT:  Well, acceptance of responsibility

 5    requires truthfully admitting the conduct, not just of the

 6    offense of conviction, but also truthfully admitting and not

 7    falsely denying additional relevant conduct.  So that was my

 8    concern.

 9              MR. HAAG:  Yes--

10              THE COURT:  But I understand--I understand your

11    position.  Sorry.  Was there something else?

12              MR. HAAG:  Yes, sir.  No, I think, Your Honor, just

13    because of the more limited scope of relevant conduct under

14    2A6.1, again, I'll give him the benefit of the doubt that he

15    was talking about statements outside the ones that would be

16    included in relevant conduct here, because he did not state

17    specifically the exact statements he was talking about, other

18    than about the Holocaust.

19              THE COURT:  Okay.  All right.  Thank you.

20              Mr. King, would you like to be heard on this?

21              MR. KING:  Your Honor, I believe I will probably

22    pretty closely echo the government's position.

23              And I incorrectly said something earlier, Your

24    Honor.  I think I made a statement, and the Court corrected me,

25    regarding the comment regarding the Holocaust not being, I

1    think, specific and an identifiable group.  And the Court

2    corrected and said that obviously is.

3            My argument, Your Honor, was within the scope of

4    the distinct group of who was targeted within a threat.  I

5    think Mr. Goltz, in, partly, response to what I said, was

6    making an attempt to explain that comment.  The government is

7    correct regarding those statements that fall within Count 1.

8    He recognizes that those are two threats.  There has been not a

9    contesting of those issues.  Within his allocution to the

10   Court, there wasn't a denial or a contesting of those issues.

11           THE COURT:  He said they're digital

12   tongue-in-cheek, just over-the-top writing, how he always

13   writes.

14           MR. KING:  Your Honor, that applies--  Mr. Goltz's

15   online persona was bombastic.  That's not--  I argue out of

16   both sides of my mouth, and I concede to the Court that I do

17   that, and I'm not trying to convince the Court to rob the

18   acceptance of responsibility.

19           Part of what Mr. Goltz did online was what I

20   referenced the Court, what's referenced in the sentencing

21   memorandum.  There is this world online where--

22           THE COURT:  Yeah, I don't need to hear about that.

23   I understand the world online.  I was just focused on his

24   statements today.

25           MR. KING:  I understand.  But I think some of what

1    Mr. Goltz is saying is that these are 19 statements that are

2    taken out of where they were placed.  It doesn't minimize what

3    is within those statements, but the broader context of the

4    overall vileness--  We've heard from Mr. Liddy regarding other

5    statements that other people have made.

6            Mr. Goltz did not say this, but I know that he has

7    shared this with me.  The address that Mr. Goltz shared had

8    previously been shared.  That doesn't minimize Mr. Goltz's

9    actions, but I think what he's saying is the context in where

10   and what I was saying.  I was saying things that even he knows

11   is not who he was, and I think that is all part of his

12   explanation and trying to explain to the Court where he was.

13   That doesn't-- because he makes the explanation that it's out

14   of context and that he doesn't--those statements are not who he

15   is does not mean that he does not notice and recognize what

16   those statements that he made are.

17           THE COURT:  Yeah, I wish he would have said that.

18   But I understand.  I understand your point.  I understand the

19   government's point.  You're very lucky to litigate against

20   someone as candid and as measured as Mr. Haag, because I think

21   most people--most Assistant U.S. Attorneys would hear those

22   statements and say, absolutely, there's not an acceptance.

23           But that's why I asked the parties.  I'm genuinely

24   interested in their view, because maybe I just heard it wrong.

25   But I hear you both telling me that you think he has accepted.

1    I think it's a very, very close call.  I don't think he really

2    has.  I'll think about it some more before I make an ultimate

3    decision.  But thank you for that, Mr. King.

4              MR. KING:  Yes, Your Honor.

5              THE COURT:  All right.  Mr. Haag, was there

6    anything else?

7              MR. HAAG:  No, Your Honor.  Thank you.

8              THE COURT:  Okay.  All right.  Mr. Haag, do you

9    know any reason why the Court cannot lawfully impose sentence

10   at this time?

11             MR. HAAG:  No, Your Honor.

12             THE COURT:  Mr. King?

13             MR. KING:  I apologize, Your Honor.  No, Your

14   Honor.

15             THE COURT:  I have carefully reviewed the

16   presentence report, its addendum, and its second addendum.  I

17   inform the defendant that the plea agreement is finally

18   accepted.  Judgment and sentence will be consistent with it.

19             I'm required by statute to impose a sentence that

20   is sufficient, but not greater than necessary, to comply with

21   the purposes of sentencing set forth in Section 3553(a)(2), and

22   to consider all the factors in that statute, which I have done.

23             All that means is, I consider certain guideposts in

24   every case to try to figure out what's a reasonable sentence.

25   One of those is the nature and circumstances of the offense, or

1    what did you do.

2           We've had extensive discussion about that.  We've

3    heard from one victim.  We heard a letter from another victim.

4    The comments here are completely outrageous, and they weren't

5    isolated.  This isn't a situation where you fall down a rabbit

6    hole; you're having a bad day; you're angry; and instead of

7    kicking the dog, you, you know, are an internet tough guy.

8    This is repeat vile, violent statements that turned to threats,

9    and you back those up.

10           On one website, there was a long history of

11   threatening statements against many targets, including law

12   enforcement, government officials, Jewish people, and others.

13   Some examples include, "I want to throw that Jew in the oven so

14   badly I can taste it."  Another, "We're in dire need of a real

15   Holocaust."  Another, on a post related to a federal judge, the

16   defendant commented, "Find out if she has children and where

17   they go to school."  Another regarding N.P., the Speaker of the

18   House, you said, "I would love to peel the Speaker's skin off

19   of her body, douse her in gas, and light a match."

20           But you didn't stop there.  On a different website,

21   there were, again, multiple statements.  "Hypothetically," you

22   said, "mass shootings"--"a mass shooting of poll workers and

23   election officials in these highly suspect precincts might be

24   the way to go."  Another, "Someone should have just walked in

25   and shot them all.  They're all trash."  Another, "Someone

1    needs to get to these people and," in all caps, "their

2    children.  The children are the most important message to

3    send."

4              Another, "Let's hope they go for," speaking of the

5    Prime Minister of Canada's, "children first.  Then he'll feel

6    this guy's pain."  Another, regarding a county official, "It

7    would be a shame if someone got to his children.  There are

8    some crazies out there.  This kind of info shouldn't be readily

9    available on the internet."  But nevertheless, of course, you

10   shared an address.

11             Regarding another official, "He has got a wife

12   that's a lawyer too.  We need to find out her name and where

13   she works.  I don't think she has kids, but I'm not 100 percent

14   on that."

15             Someone tries to say wait, wait, wait, kids--kids

16   are off limits.  "No, nothing," all caps, "is off limits.  It's

17   people like you that are supposely with us who don't have the

18   stomach to do whatever it takes.  That's why we lose.  They

19   have come after our kids every way possible, and you have some

20   aversion to targeting theirs?", question mark.  "Thanks for

21   letting me know what foxhole I don't want to be in."

22             And then finally, "The children are the most

23   important ones to get because it sends a message 100 years into

24   the future that people will pay the price for the sins of the

25   father.  Dead children burn the memories"--"burn into the

1    memories of people.  Dead adults are forgotten much easier."

2            You can't overstate just the seriousness and the

3    vile nature of those comments and threats.  That you said,

4    "Hey, I'm right here, I'm in Lubbock, Texas; I'm not afraid; I

5    mean this," is concerning.  That you targeted election

6    officials and public servants just trying to do their job--

7    And you can disagree with how they do it, and you can be

8    curious, and you can, you know, be angry about the result.  But

9    targeting these people specifically with threats resulting in

10   the impact that we've heard to real people and their children

11   is inexcusable.  It's incredibly serious, and it does damage,

12   not just to those victims, but to our community and our

13   democracy.  Again, you can disagree all you want, but nothing,

14   nothing, nothing can excuse the threats, the violence, and the

15   vile comments that you said over and over and over again.

16           I appreciate the comments from the victim.  They

17   will be taken into account.  The grace that was showed by the

18   victim saying, "Hey, Judge, actually don't go to the top of the

19   statutory range here, because it has effects on the family,"

20   that's--I've never seen something like it from a victim, who

21   was trapped in his house, putting body armor on his children,

22   and now asking me for mercy.  You certainly didn't afford that

23   level of grace to those that you disagreed with, that you

24   thought were doing something wrong.  Your result--or your

25   answer to that was calling for violence, again and again and

1    again.

2            Now, it's not the only thing I consider.  What you

3    did here is inexcusable and incredibly concerning.  I've also,

4    however, considered your history and your characteristics, and

5    you have no prior convictions, no criminal history, and that

6    certainly mitigates.  That weighs heavily in your favor.

7            I understand your attorney's arguments today.  I've

8    taken all that into account.  I've taken the sentencing

9    memorandum that--or memoranda that have been filed into

10   account, and their understandable points.  One is, essentially,

11   you're a really good father and community member to those that

12   you get along with, and I don't doubt that.  It certainly

13   sounds, given the support that's here, that you are an

14   incredibly good family member and community member to those

15   that are around you that you agree with.

16           You bring an equal level of passion to those you

17   disagree with, and I wish that that kind of polar opposite or

18   photo negative wasn't present, but clearly it is.  For those

19   that you love, you will do anything.  But it appears that for

20   those that you hate, you'll also do anything, including calling

21   for violence against them and their children.

22           And so, as often the case, our biggest strengths

23   can be our biggest weaknesses.  You obviously feel deeply, but

24   you let that take you down a path of crime and violence, and

25   that can't be excused.

1          You are lucky to have the support.  I understand

2     that people are complicated.  I oftentimes see defendants--

3     This is not--frankly, it's just not unusual that, oh, he's a

4     great soccer coach, baseball coach, took care of Grandma, but

5     he also did X, Y, and Z bad things.  People are complicated,

6     and I wish the good person that I heard about from the three

7     people who came and spoke on your behalf would have been the

8     better angel on the shoulder and taken over and said, you can't

9     say these things.  You just can't do that.

10          But that didn't happen.  What happened is that you

11     said it not once, not twice, but over and over and over again,

12     and I have to take that into account.

13          I've heard the arguments about the social media

14     echo chamber.  Certainly not a healthy place.  Certainly

15     something to avoid.  But your comments were particularly bad.

16     That's the reason you're here and a lot of other people that

17     were saying stupid things and outrageous things, but not

18     criminal things--that's why they're not here and you are.  You

19     weren't echoing comments like that.  You were going above and

20     beyond, and you crossed a very, very thick line into

21     criminality.

22          It's often the case that a defendant's crime not

23     only affects the victim and the community, but it affects his

24     or her family as well.  They're victims too.  They didn't do

25     anything to be here.  Sadly, that's true in a lot of cases.

1           And I appreciate the victim's statement about the

2    effect, and I'll take that into account, like I always take it

3    into account.  These are real people with real families.  But

4    that's almost always true, and I can't ignore the crime that

5    you chose to commit because your conduct will negatively affect

6    your own family.  I have to balance a lot of things.  Congress

7    tells me that.  The people, through Congress, have told me I'm

8    required to balance multiple considerations.  I have done that,

9    and I will do that.

10           I don't think you've accepted responsibility.  I

11   really don't.  The way you said it, the way you talked to me

12   today, it was just excuses; that's it.  Now, I'm not going to

13   remove the points, in light of what the Assistant United States

14   Attorney argued to me and what your lawyer has argued to me.

15   But I don't--I really don't think you have.  You haven't

16   grappled with it.  It was, "I'm an over-the-top writer, this is

17   tongue-in-cheek," excuse, excuse, excuse.  Nothing indicating

18   that you have really and fully and clearly, which is required

19   under the guidelines, accepted responsibility.

20           But because of the particular nature of this crime

21   and because I do give the benefit of the doubt to both your

22   attorney and the prosecutor and I respect them both deeply, I

23   won't remove the points.  I am going to take it into account in

24   fashioning the overall sentence.

25           The other factors include the requirement that I

1    impose a sentence that reflects the seriousness of the offense,

2    and this one is incredibly serious.  It affects so many people.

3              I have to promote respect for the law, and this

4    demonstrated a complete disrespect for the law, public

5    servants, and then calling for violence against those people.

6              I have to give a just punishment, afford adequate

7    deterrence, and protect the public.  I do think there are

8    things present that were not adequately taken into account in

9    the advisory guideline range; most particular, the number of

10   the threats, the nature of the threats, and that you

11   consistently called for violence against children.

12             So I'm denying the defendant's request for a

13   downward-variance sentence of 12 months and one day.  I think

14   that would be woefully inadequate.  I also think a sentence

15   within the advisory guideline range would be inadequate for all

16   of the reasons that I have stated today.

17             After considering all of the statutory factors, the

18   purposes of sentencing, and the parties' arguments, I have

19   determined that a sentence of 42 months is sufficient, but not

20   greater than necessary.

21             I don't think I need to or should go to the top of

22   the statutory range.  I think that would be unreasonable.  But

23   I'm also not going to go any less than 42 months.

24             I believe that the guideline calculations announced

25   were correct, but to the extent they were incorrectly

1    calculated, I inform the parties that I would have imposed the

2    same sentence without regard to that range, and I would have

3    done so for the same reasons, in light of the 3553(a) factors.

4    After all, this is a nonguideline variance sentence.  So even

5    if I were incorrect about the two-threat enhancement, I would

6    vary upward to 42 months.

7           Upon release, you're going to be on supervised

8    release for a term of 3 years.  While on release, you shall

9    comply with the mandatory conditions of release listed in your

10   presentence report and in Section 3583(d).

11          Mr. King, did you and your client receive and

12   discuss my written notice of intent to impose the standard and

13   special conditions?

14          MR. KING:  Yes, Your Honor, we did.

15          THE COURT:  Do you have any objections to them?

16          MR. KING:  Your Honor, there is no objection.  If--

17   We continue to be of the position that, hopefully through the

18   immigration court, Mr. Goltz is not deportable or removed.  If

19   he is, would the terms of supervised release be placed on hold

20   while he was removed?

21          THE COURT:  I don't understand your question.

22          MR. KING:  I apologize.  Frequently, within the

23   supervised release conditions, there's a condition where, if an

24   individual is removed from the country, they no longer are

25   required to abide by the terms of--

```
 1                    THE COURT:  Oh.

 2                    MR. KING:  --the supervised release.  And with the

 3       statements within the conditions stating that he is to report

 4       for immigration after he is released, if he is removed, then

 5       the conditions of supervised release would no longer apply?

 6                    THE COURT:  That's my understanding.

 7                    MR. KING:  Okay.

 8                    THE COURT:  Yeah, if he were outside of the

 9       United States's jurisdiction, that's usually what happens.

10       There's no way for a probation officer to adequately or

11       effectively supervise the person.

12                    Mr. Haag?

13                    MR. HAAG:  Yes, Your Honor, that's correct.  If

14       someone is removed from the United States, then the conditions

15       are suspended; there's no need to follow those conditions.

16                    THE COURT:  Yes.

17                    MR. KING:  Okay.  And just as a clarification and,

18       again, not conceding the removeability issue.

19                    THE COURT:  Okay.  Yes, I understand that.

20                    Okay.  Hearing no objections, all of those

21       conditions are adopted today.  They will be included in my

22       judgment.  I find they are reasonable and relate to all of the

23       appropriate statutory considerations, and they impose no

24       greater deprivation of liberty than reasonably necessary under

25       the statute.
```

1            I find that the defendant does not have the ability

2   to pay a fine.

3            But I'm going--and I will require that he pay the

4   mandatory special assessment of $100 to the United States, due

5   and payable immediately.

6            I'm going to recommend that, while incarcerated,

7   the defendant receive appropriate mental health treatment, but

8   I didn't lengthen the term of imprisonment to promote

9   rehabilitation.

10           Sir, to the extent you have not waived your right

11  to appeal, you do have the right to appeal your conviction and

12  your sentence.  If you'd like to appeal, you need to file a

13  notice of appeal within 14 days of today in this court.  If you

14  want to do that, just tell your attorney.  He's very familiar

15  with that process, and he can help you get that done.

16           I know that you have retained counsel, but, if

17  appropriate, he can also ask that the costs of the appeal go to

18  the United States, and not to you.

19           Do you understand those appellate rights?

20           THE DEFENDANT:  Yes, sir.

21           THE COURT:  Okay.

22           All right.  Mr. King, anything else from the

23  defense?

24           MR. KING:  Your Honor, the nonbinding request for

25  FCI Big Spring.  I know it was a long time ago that I requested

1      that.

2                  THE COURT:  That's been granted.

3                  MR. KING:  And we would--the Fifth Circuit requires

4      a contemporaneous objection.  As this was an upward variance,

5      we would object to the substantive unreasonableness of the

6      sentence.

7                  THE COURT:  Okay.  I understand.  You just think

8      the sentence is just too long?

9                  MR. KING:  Yes, Your Honor.

10                 THE COURT:  Yeah, I understand that objection.  For

11     all the reasons that I stated earlier, that objection is

12     overruled.

13                 I don't impose the sentence lightly, and I do

14     understand the impact it has on family members.  I have to

15     balance a lot of factors, and the conduct here is incredibly,

16     incredibly serious.

17                 I hope, Mr. Goltz, that you use this time to truly

18     understand how in the world that you got to that podium, to

19     grapple with the statements that you did make and the threats

20     that you made and the impact it had on other people so you can

21     make sure you never get there again.

22                 And I really don't think you will.  I really don't.

23     But only you can do that.  Your attorney can't do it.  I can't

24     do it.  But there are plenty of people who have never been in

25     trouble who have an aberration, do something bad, go to federal

1     prison.  Most of them go on to live perfectly normal, happy

2     lives afterwards.  This is going to be a dark valley, but it's

3     not one you can't get out of if you really think about how you

4     got here.

5              Anything else from the United States?

6              MR. HAAG:  No, Your Honor.  Thank you.

7              THE COURT:  Okay.  Mr. Goltz, at this time, you are

8     remanded to the custody of the United States Marshal, and I

9     wish you good luck, sir.

10         (END OF HEARING)

11

12         I, Mechelle Daniel, Federal Official Court Reporter in and
      for the United States District Court for the Northern District
13    of Texas, do hereby certify pursuant to Section 753,
      Title 28, United States Code, that the foregoing is a true and
14    correct transcript of the stenographically reported proceedings
      held in the above-entitled matter and that the transcript page
15    format is in conformance with the regulations of the Judicial
      Conference of the United States.

16

17     _/s/ Mechelle Daniel_____     **DATE**_ AUGUST 18, 2023___

18    MECHELLE DANIEL, CSR #3549
      FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25